In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1177 & 08-1615

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARWIN P. MOORE and BRUCE E. KNUTSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 07 CR 25—**Barbara B. Crabb**, *Chief Judge*.

ARGUED JANUARY 15, 2009—DECIDED APRIL 21, 2009

Before RIPPLE, MANION, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*. The date: April 14, 2005. The time: 6 p.m. The place: Ho-Chunk casino in Baraboo, Wisconsin. The event: a drawing to determine who would walk off with $10,000. Undoubtedly, excitement was in the air. Realistically, the average schlemiel had only a .000067 percent chance of winning. But another participant in the drawing had to like his chances: Bruce

Knutson had a 30 percent chance of coming up a winner. And when the winning entry form was pulled from the barrel—ta da—the winner was Bruce Knutson! The lucky winner then posed for a publicity picture, signed off on a tax form, received a check for $5,000, and pocketed $5,000 in cash. It was, we suspect, a night to remember. But all was not, as we shall see, quite as it seemed. The rest of the story explains why Knutson and his buddy, Darwin Moore, are here appealing their convictions after they were found guilty of bilking the casino out of $10,000.

This case started with Ho-Chunk's "Tax Time Blues Giveaway," a drawing, which awarded five lucky casino patrons—one every hour starting at 6:00 p.m.—with a $10,000 prize. To earn entry forms, the written rules stated that patrons had to register at the guest service booth, where they would receive their first form. After that, gamblers could get additional entry forms for every 50 points they earned at the slot machines or every hour they spent playing blackjack. Although not explicitly stated, some casino staff could also hand out extra entries at their discretion. The official rules were silent about counterfeiting entry forms. The casino accepted entries for six weeks and the drawing, as the name of the contest suggests, was held the day before the April 15 tax-filing deadline.

Knutson and Moore heard about the drawing and set about to win it. With the help of Moore's then-girlfriend, Grace Hewitt, the two hatched a plan to make their own entry forms and stuff the promotional barrels to up their

odds of winning. They purchased orange stock paper to match the forms handed out by the casino and used Moore's copier to produce fake entry forms. But Moore and Hewitt were no Bonnie and Clyde. Weeks before the drawing the two split, and Hewitt decided to exact some revenge. She snitched on Knutson and Moore, telling casino authorities about the scheme, even providing them with a few of the bogus entry forms. The fake forms were easily identifiable because the watermark on the casino's form became pixelated after it was photocopied.

After receiving this tip, an investigator kept an eye on Knutson and Moore when they entered the casino and, over the course of a week, observed both men drop multiple entry forms into the drawing barrels. They would stagger their submissions, depositing the forms at different times throughout the evening.

On the night of the drawing, one of Knutson's entries was the first one pulled from the barrel. He filled out all the necessary paperwork to claim his prize and provided the casino with his social security number and drivers license number. After the drawing, Ho-Chunk's investigator went through the entries and discovered that Knutson (4,710) and Moore (4,645) together submitted 9,355 of the approximately 15,000 entry forms. So together, the two had 62 percent of the total entries in the drawing. The thousands of other participants had the other 38 percent. And according to the casino's database, Knutson and Moore "earned" only 23 entries through their gambling.

The Wisconsin Department of Justice eventually stepped in and sent two agents to interview Knutson and Moore. During the interview, both claimed that they had submitted only a couple hundred forms, on several occasions, explaining that they would pick up extra entry forms they found in the casino or submit forms they had received from patrons who came to the casino on tour buses. Since entrants had to be present at the drawing to claim the prize, these out-of-town patrons were presumably willing to give up their entry forms. When asked if they had manufactured their own forms, they denied doing so, emphasizing that they had not submitted any forms that were photocopied.

Knutson and Moore were eventually indicted for conspiring to violate 18 U.S.C. § 1167(b), which penalizes anyone who "abstracts, purloins, wilfully misapplies, or takes and carries away with intent to steal" money that belongs to a gaming establishment run by an Indian tribe. 18 U.S.C. § 371. The defendants waived their right to a jury trial and the case proceeded to a bench trial. The district court found both defendants guilty. Each received a sentence of 10 months. They were also ordered to pay back the $10,000.

Knutson and Moore begin by attacking the indictment. They assert that it is insufficient because, in their view, the allegations that they stuffed the barrels with counterfeit entry forms fail to state an offense. *See* Fed. R. Crim. P. 7(c)(1); 12(b)(3)(B). They claim they were merely trying to increase their odds of winning, which, they contend, is not illegal. They were unsuccessful in asserting this

same argument in a motion to dismiss before the magistrate judge who recommended that the district court deny the motion. Receiving no objections from the defendants, the district court adopted the recommendation. A failure to object to a magistrate judge's recommendations constitutes a waiver, which would ordinarily preclude our review. *See United States v. Hall*, 462 F.3d 684, 688 (7th Cir. 2006). But here, the government has "waived waiver" by asserting that we can review the decision *de novo*. *See United States v. Murphy*, 406 F.3d 857, 860 (7th Cir. 2005).

Everything we have said so far is prelude to a pretty straightforward conclusion—the indictment is easily sufficient. An indictment need not say much to be deemed sufficient—it must: (1) state all the elements of the crime charged; (2) adequately apprise the defendants of the nature of the charges so that they may prepare a defense; and (3) allow the defendant to plead the judgment as a bar to any future prosecutions. *United States v. Castaldi*, 547 F.3d 699, 703 (7th Cir. 2008). What's more, we look at the indictment as a whole, focusing on a practical, rather than a hypertechnical, reading of the document.

Here, the indictment notes the statutory bases for the conspiracy count, listing the elements of the crime. It also provides, with quite a bit of detail, the factual backdrop of the scheme. It explained how gamblers could earn forms and how Knutson and Moore took "steps to win the Tax Times Blues Giveaway by cheating, that is, by stuffing the promotion barrels with counterfeit entry

forms." The indictment also explains that Knutson and Moore purchased bright orange paper from a local Office Max, stuffed the drawing with over 9,000 fake forms, and recruited two others (two unsuspecting Knutson relatives) to help submit bogus entries. This factual backdrop gave the defendants plenty of ammunition to prepare their defense and was specific enough to avoid any later double jeopardy concerns.

But the defendants still urge that the indictment was defective, since, in their view, they had only exploited a loophole in the rules—they note in particular that the rules did not specifically prohibit their behavior and that casino staff members handed out entry forms in ways not enumerated in the rules. But when evaluating the sufficiency of an indictment, we focus on its allegations, which we accept as true. *United States v. Vitillo*, 490 F.3d 314, 320-21 (3d Cir. 2007); *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006); *United States v. Sharpe*, 438 F.3d 1257, 1258-59 (11th Cir. 2006); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). "Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Todd*, 466 F.3d at 1067. The precise wording of the rules and the casino's enforcement of those rules were not mentioned in the indictment. Whether Knutson and Moore broke the rules or just took advantage of a technicality is a question of fact that could not be decided without a trial.

At this stage, our inquiry is narrow. We must decide whether it's possible to view the conduct alleged as an

agreement to steal $10,000 from the casino. And we have no problem concluding that Knutson's and Moore's behavior—stuffing the promotional barrels with over 9,000 fake entries, exponentially increasing their odds of winning—can only be construed as a tricky scheme to dupe the casino out of its money. The "Tax Time Blues Giveaway" created incentives for gambling. The drawing rewarded patrons who spent a lot of time (presumably losing money) at the slots or blackjack tables with an increased chance of winning the prize money. By stuffing the barrels with counterfeit entries, Knutson and Moore subverted this purpose and deprived Ho-Chunk of a fundamental right of ownership—that is, the right to give away its money the way it wanted to do.

To the extent that Knutson and Moore rely on facts outside of the indictment, they are really arguing that there was insufficient evidence to support their convictions. This argument is an uphill battle—we review the evidence in the light most favorable to the government and will reverse only if no rational trier of fact could have found the defendants guilty beyond a reasonable doubt. *United States v. Knox*, 540 F.3d 708, 719 (7th Cir. 2008). To find the defendants guilty, the government had to prove that Knutson and Moore agreed to abstract, purloin, or take away with intent to steal the casino's money. 18 U.S.C. §§ 371, 1167(b); *United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006).

Under this deferential standard, Knutson and Moore's challenge fails. It is true that the rules do not specifically prohibit the submission of fake (especially thousands of

them!) entry forms, but that does not mean the casino condoned counterfeiting. As the Latin lovers might say, *expressio unius est exclusio alterius*—that is, by listing the proper avenues for receiving entry forms, one should logically infer that the casino meant to exclude others avenues. The defendants note that the rules had some wiggle room: additional entry forms could be handed out by the casino's staff. But in all instances the forms came from the casino, they were not bogus forms. By counterfeiting thousands of entry forms, Knutson and Moore set out, by trickery, to take $10,000 of the casino's money, and such chicanery is prohibited by § 1167(b). *See, e.g.*, *Bell v. United States*, 462 U.S. 356, 360 (1983) (holding that 18 U.S.C. § 2113(b), which prohibits taking and carrying away, with intent to steal or purloin money from a bank, includes theft by false pretenses, i.e., acquiring title to property through trickery).

The defendants maintain that they were open and honest about their behavior—they used their real names on the forms and Knutson gave the casino his real name and social security number to claim the prize—which, they contend, belies any intent to steal from the casino. But the duo had to accurately provide this information to collect the prize money, so this honesty says little about their intentions. Meanwhile, their other behavior suggests that they knew they were up to no good. They furtively staggered the submission of the fake forms over multiple days and asked two other people to help stuff the barrels. During the investigation they continued to obfuscate their conduct by denying that they had created the entries. Instead, they claimed to have

submitted forms that they found lying around or had received from other casino patrons who weren't going to be present for the drawing. Looking at this evidence in the light most favorable to the government, it is enough to sustain its burden.

Accordingly, we AFFIRM the judgment of the district court. The stays of the defendants' sentences are dissolved and the case remanded to the district court so it can set a date for the defendants to report for the service of their sentences.