**UNITED STATES of America,**

v.

**Sandra HATFIELD, David H. Brooks, Patricia Lennex, Defendants.**

No. 06–CR–0550 (JS).

United States District Court, E.D. New York.

Jan. 22, 2010.

Richard Thomas Lunger, Jr., Esq., Christopher Allen Ott, Esq., James Halleron Knapp, Esq., James M. Miskiewicz, Esq., United States Attorneys Office, Central Islip, NY, for Government.

Roland G. Riopelle, Esq., Maurice H. Sercarz, Esq., Sercarz & Riopelle, LLP, New York, NY, for Sandra Hatfield.

John C. Meringolo, Esq., Meringolo and Associates, P.C., Zaki I. Tamir, Esq., Gofer Tamir and Assoc., James M. LaRossa, Esq., Richard Ware Levitt, Esq., Yvonne Shivers, Esq., Law Offices of Richard W. Levitt, New York, NY, Kenneth Ravenell, Esq., William H. Murphy, Jr., Esq., The Murphy Firm, Baltimore, MD, Roger V. Archibald, Esq., William C. Thompson, Esq., Brooklyn, NY, for David Brooks.

Michael F. Bachner, Esq., Bachner & Herskovits, P.C., New York, NY, for Patricia Lennex.

## ORDER

SEYBERT, District Judge:

Pending before the Court is the Government's motion [Docket No. 670] to have the Court determine the "threshold admissibility of certain other acts in the government's case-in-chief to prove the non-tax charges in the Superceding Indictment." Alternatively, the Government asks the Court to admit these acts as Rule 404(b) evidence of Defendants David Brooks' and Sandra Hatfield's purported "common plan and scheme to enrich themselves by attempting to defraud auditors, shareholders, and the investing public." The Government also asks to admit certain acts as *Giglio* evidence. Mr. Brooks and Ms. Hatfield have opposed the Government's motion to the extent that it seeks to introduce "other acts" evidence either during the Government's case-in-chief or as Rule 404(b) evidence. They have not opposed the Government's request to admit certain acts as *Giglio* evidence. Thus, the Government's motion to admit *Giglio* evidence is GRANTED as unopposed. The Government's motion to admit "other acts" evidence is GRANTED IN PART AND DENIED IN PART, as discussed below.

## DISCUSSION

### 1. *The NASDAQ Evidence*

On or about February 17, 1998, DHB applied to be listed in NASDAQ's Small Market Index. NASDAQ informed DHB that it would include it in the Small Mar-

ket Index if: (1) Mr. Brooks resigned as DHB's CEO; and (2) DHB's independent board members chose his successor. The Government alleges that DHB did not comply with NASDAQ's conditions. Instead, the Government claims, Mr. Brooks made "multiple false statements to NAS-DAQ" indicating that he had resigned as CEO, and that his compensation was between $50,000 and $191,917. In addition, the Government alleges, both Mr. Brooks and Ms. Hatfield made false statements indicating that Ms. Hatfield was DHB's CEO and that she was running the Company's day-to-day operations. In fact, the Government claims, Mr. Brooks did not resign as CEO and continued to control DHB, which ultimately led to NASDAQ removing DHB from its Index.

The Government contends that this evidence "relates to the accounting frauds, the looting and the obstruction charges." The Government insists that this evidence demonstrates the Defendants' "intent, plan, modus operandi and absence of mistake" by showing "how they will lie to any governmental entity to keep their stock on a public exchange," including a "willingness to lie about Brooks' employment status and management role." The Government claims that the alleged lies to NASDAQ "was one of the first steps that Hatfield and Brooks took in their plan to dump their DHB shares on the open market with knowledge that the company was not making full or accurate disclosures to the public." As such, the Government seeks to admit the NASDAQ evidence during its case-in-chief as being "inextricably intertwined" with the Indictment's charges.

Mr. Brooks and/or Ms. Hatfield respond that the NASDAQ evidence is inadmissible, either during the case-in-chief or as Rule 404(b) evidence, because: (1) the alleged NASDAQ lies did not concern a scheme to defraud DHB's shareholders concerning the Company's financial condition; (2) occurred years before the supposedly fraudulent financial statements were made; and (3) DHB's share price resulted from market conditions unforeseeable in 1998. In addition, Mr. Brooks disputes the Government's contention that he lied to NASDAQ concerning his compensation, and Ms. Hatfield disputes that she lied at all.

■ As an initial matter, the Government is wrong that the statements show how Defendants "will lie to any governmental entity." NASDAQ is not a "governmental entity." It is a private company, and, in fact, its parent's company's stock trades on the exchange under the ticker symbol "NASDAQ." The Government is also wrong that the alleged NASDAQ lies are "inextricably intertwined" with the Indictment's charges. Indeed, the Indictment itself refutes the Government's "inextricably intertwined" claims, as it tells a compelling, complete and detailed story without mentioning the Defendants' alleged fraudulent statements to NASDAQ. Furthermore, as Defendants note, the alleged NASDAQ scheme ceased before the Indictment's allegations began. And the purported NASDAQ scheme did not concern any kind of financial or accounting fraud. In short, evidence concerning the purported NASDAQ scheme is not admissible as direct evidence because the alleged NASDAQ scheme involved "separate, discrete incidents of alleged fraud or deceit," not conduct that was "inextricably intertwined" with the Indictment's charges or necessary to complete the Indictment's story. *See U.S. v. Ferguson,* 246 F.R.D. 107, 115 (D.Conn.2007).

Nor is the NASDAQ evidence admissible under Rule 404(b). On this point, *U.S. v. Cushing,* 00–CR–1098, 2002 WL 1339101, *1–2 (S.D.N.Y.2002) is instructive.

There, the Court rejected the Government's efforts to admit evidence concerning a lie told "to a separate investigatory authority on a different subject at a different point in time." *Id.* The Court held that "[w]hether [the defendant] lied previously makes it no more likely that he knew he made an untruthful statement to the SEC," and would, instead "only tend to demonstrate [the defendant's] willingness to lie to an investigatory authority." *Id.* Here, the Government's argument almost identically parrots the very contention *Cushing* rejected, as the Government freely admits that it seeks to admit the NASDAQ evidence to show that Defendants "will lie to any governmental entity." But, as *Cushing* found, "[s]uch a result is exactly the type of consequence that Rule 404(b) seeks to preclude." *Id.*

But even if the NASDAQ evidence might, arguably, have *some* probative value in regards to Defendants' "intent" or "absence of mistake," other concerns tip against its admissibility. *See* Fed.R.Evid. 403, 404(b). Under Fed.R.Evid. 403, the Court may exclude evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, the NASDAQ evidence is prejudicial, as it suggests Defendants' propensity to lie to investigative authorities. *See Cushing*, 2002 WL 1339101 at *1–2. And, in a trial that will already likely last for 15–20 weeks and include tens of thousands of pages of witness testimony and exhibits, the NASDAQ evidence stands a good chance of confusing the jury as to the actual crimes charged, which a curative instruction may not alleviate. Finally, conducting a "mini-trial" as to whether the Defendants lied to the NASDAQ will necessarily result in "undue delay," while adducing no evidence con-cerning whether the Defendants committed the charged crimes.

Thus, the Government's motion to introduce the NASDAQ evidence is DENIED.

### 2. *The Tax Evidence*

■ The Government contends that Ms. Hatfield failed to report a condominium she received from DHB on her 2003 to 2005 tax returns. The Government further contends that she reported a 2004 $750,000 bonus only when the SEC began investigating the Company, and that Mr. Brooks also failed to pay taxes on his income and benefits. The Government contends that this evidence is "inextricably intertwined" with the Indictment's non-tax charges because Defendants "both claim that they were entitled to the funds looted from the company" and "[t]he mere fact that they did not pay taxes on the supposedly valid income shows that the income is not valid." The Court agrees. If, as Defendants claim, they were legally entitled to all the compensation they received from DHB, they would have reported this compensation as income to the IRS. The fact that they allegedly did not demonstrates the Defendants' consciousness of guilt. *See U.S. v. Hogan*, 886 F.2d 1497, 1507 (7th Cir.1989); ("evidence that Hogan did not report the money he received from attorneys suggests that he knew that the payments were unlawful"); *see also U.S. v. Latysheva*, 162 Fed.Appx. 720, 725 (9th Cir.2006) (unpublished) (evidence that defendants failed to pay taxes more probative than prejudicial "because they provided circumstantial support for the knowledge element of the money laundering offense"). The Court admits the tax evidence mentioned in the Government's motion as direct evidence.

### 3. *The Insider Trading Evidence*

The Government alleges that, in 1989, while employed by Jeffrey Brooks Securi-

ties, Inc. ("JBS"), Mr. Brooks failed to properly supervise a JBS employee who engaged in insider trading. Indeed, rather than taking measures to stop this employee's insider trading, the Government contends that Mr. Brooks "decided to follow" this employee's trading pattern, in an effort to profit from the employee's improper conduct.

■ The Government contends that Mr. Brooks' alleged insider trading violations are "inextricably intertwined" with the charged crimes because, "[w]hen drummed out of trading, Brooks invested his funds into DHB." The Court strongly disagrees. At most, the alleged insider trading violations serve as the first step in a strained 12–year long chain-of-causality which, ultimately, supposedly led Mr. Brooks to decide to commit the charged offenses. But these violations did not concern DHB stock, nor the stock of any other company in which Mr. Brooks served as an officer or director. They did not concern Mr. Brooks trading on material nonpublic information in his possession. And they did not result in the SEC bringing any charges against Mr. Brooks for anything more than, essentially, a failure to supervise claim. The Government has cited no authority, and the Court's own research has discovered none, to suggest that prior acts related to insider trading, at another company, in a different decade, can somehow be considered "inextricably intertwined" with an indictment's charges. Thus, the Court denies the Government's motion to admit the insider trading evidence as direct evidence.

The Government also contends that the insider trading evidence goes to Mr. Brooks' "knowledge, intent, modus operandi and absence of mistake." Again, the Court disagrees. Whether Mr. Brooks engaged in insider trading-type conduct in 1989 says nothing about Mr. Brooks'

knowledge or absence of mistake in 2004, because it provides no useful information concerning whether Mr. Brooks possessed material non-public information when he made the DHB stock trades at issue. Similarly, Mr. Brooks' 1980's conduct says nothing about his "modus operandi" with respect to the Indictment's charges because, as discussed above, the alleged 1989 acts were manifestly different than the charged conduct. And, although Mr. Brooks' prior alleged willingness to tolerate and benefit from a subordinate's insider trading might, arguably, have some probative value concerning Mr. Brooks' intent, this probative value is substantially outweighed by: (1) its prejudice to Mr. Brooks as invalid propensity evidence; (2) the danger that it would confuse the jury; and (3) the undue delay that a "mini-trial" concerning this evidence would require.

### 4. Mr. Brooks' Disputes with Mr. Bash and Mr. Pelling

The Government alleges that Mr. Brooks breached agreements he reached with two DHB investors, Ron Bash and Brett Pelling. With respect to Mr. Bash, the Government claims that Mr. Brooks improperly attached restrictive covenants to Mr. Bash's shares, coerced Mr. Bash into transferring his shares to Mr. Brooks' brother for a discount, and then failed to deliver the $25,000 he promised for the shares. With respect to Mr. Pelling, the Government claims that Mr. Brooks improperly invalidated Mr. Pelling's share certificates. The Government contends that this evidence demonstrates that Mr. Brooks "is willing to alter DHB corporate documents ... to make money." The Government does not, however, explain how Mr. Brooks "alter[ed]" DHB documents. The Government seeks to introduce this evidence to demonstrate Mr. Brooks' intent, plan, modus operandi and

absence of mistake. In so doing, the Government apparently seeks to introduce this evidence only under Rule 404(b), and not as direct evidence.

The Court finds that whether Mr. Brooks breached contracts or engaged in aggressive negotiating tactics with Mr. Bash and/or Mr. Pelling is not probative of the Indictment's charges. But if Mr. Brooks, in fact, altered DHB corporate documents, such evidence would be probative of his intent and/or absence of mistake in connection with the alleged financial fraud. As of now, however, the Court has no information indicating that Mr. Brooks did, in fact, "alter" DHB documents in connection with his disputes with Mr. Bash and/or Mr. Pelling, or what this "alter[ing]" consisted of. Consequently, the Court DENIES this portion of the Government's motion WITHOUT PREJUDICE.

### 5. *Mr. Brooks' Spending*

■ The Government also seeks to introduce evidence concerning Mr. Brooks' "lavish" personal spending, both as direct evidence and as Rule 404(b) evidence. The Government's motion is DENIED in both respects, and the cases it cites are inapposite. In both *U.S. v. Rigas*, 490 F.3d 208, 238–39 (2d Cir.2007) and *U.S. v. Boone*, 951 F.2d 1526, 1537 (9th Cir.1991), the Court admitted evidence showing that the defendant diverted company or investor funds to his personal expenses, somewhat similar to the Government's "looting" allegations in this case. Neither case concerned how a defendant spent personal assets that he supposedly obtained illicitly. And in *U.S. v. Jackskion*, 102 F.2d 683, 684 (2d Cir.1939), *U.S. v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.1975), and *U.S. v. Anderson*, 642 F.2d 281, 285 (9th Cir.1981), the Court admitted evidence that a defendant possessed a large quantity of money,

and had no legitimate explanation for how he obtained it. Contrary to the Government's claims, in none of these cases did the Court admit this evidence to show motive. Instead, the Court admitted it because the "sudden acquisition of money," without any apparent legal source, "may, when taken with proof of other facts, have a logical tendency to prove criminal misconduct." *Jackskion*, 102 F.2d at 684; *see also Tramunti*, 513 F.2d at 1105; *Anderson*, 642 F.2d at 285. The Seventh Circuit concurs, explaining that "evidence of a lavish lifestyle" is not relevant to show motive, but is probative when a defendant disputes his "participation" in an act. *U.S. v. Ewings*, 936 F.2d 903, 906 (7th Cir. 1991). Here, there is no dispute concerning Mr. Brooks' "participation" in profitable stock trades, nor his "participation" in receiving sizeable compensation from DHB. Thus, unlike in *Jackskion, Tramunti,* and *Anderson,* the relevant question is not how he acquired the money he used to fund his extravagant lifestyle. Instead, it is whether the stock trades and compensation methods he used to acquire this money were legal. And, to resolve this inquiry, it is irrelevant if Mr. Brooks spent his fortune on lavish parties, instead of donating it to starving Malawian orphans. *See generally In re Von Behren*, 314 B.R. 169, 181 (C.D.Ill.Bnkr.2004) (alleged "lavish spending" on "illegal, immoral or otherwise imprudent activities" irrelevant). Furthermore, even before Mr. Brooks' alleged illegal activities, it is undisputed that he was a very wealthy man. Thus, it is entirely speculative whether Mr. Brooks' funding for his "lavish" personal spending came from the alleged scheme or from his sizable pre-existing fortune. *See, generally, U.S. v. Law*, 528 F.3d 888, 897 (D.C.Cir. 2008) (defendant's mortgage payments had "little or no probative value because [this evidence] does not distinguish mere spending from laundering").

*6. Mr. Brooks' "Flight"*

■ The Government also wants to introduce evidence that, "upon his firing, Mr. Brooks left the country and transferred his assets out of the country." The Government correctly argues that evidence of flight is direct evidence, as it shows consciousness of guilt. The problem, however, is that the Government has adduced no information indicating that Mr. Brooks did, in fact, "flee." At most, based on the information the parties submitted, it appears that Mr. Brooks temporarily resided in London, more than fifteen months before the Government brought any charges against him. During his sojourn in London, Mr. Brooks remained in constant contact with law enforcement authorities. Mr. Brooks then voluntarily returned to the United States, long before the U.S. Attorney's Office commenced this prosecution. And, throughout this time period, Mr. Brooks affirmatively indicated his willingness to surrender should the need arise. In short, based on the information presented to the Court, there is nothing to indicate that Mr. Brooks sought to flee or avoid arrest. Thus, in contrast to the "flight" cases the Government relies upon, Mr. Brooks' stay in London is not probative of his consciousness of guilt.

■ But Mr. Brooks' alleged decision to transfer his assets out of the country is a different matter. Mr. Brooks' opposition to this motion does not address the Government's request to introduce this evidence. And, although there is little law on the subject, the Court agrees with the Government's position that this evidence is more probative than prejudicial, as it tends to show Mr. Brooks' consciousness of guilt. *See, generally, Meier v. C.I.R.,* 91 T.C. 273, 302 (Tax Court 1988) (transfer and concealment of assets overseas "highly probative" of tax fraud). The Court admits evidence concerning Mr. Brooks' money transfers as direct evidence.

*7. Mr. Brooks' Alleged Insurance Fraud*

■ The Government alleges that, in 2003, Mr. Brooks instructed a subordinate to "fraudulently magnify the damage to the Oakland Park facility caused by Hurricane Wilma." The Government contends that this evidence is admissible under Rule 404(b). The Court agrees. Both the Indictment and the purported insurance fraud concern allegations that Mr. Brooks altered corporate records and/or instructed subordinates to do so. Thus, the alleged insurance fraud is probative of Mr. Brooks' intent and/or lack of mistake with regards to the Indictment's charges.

*8. Stock Purchases by Mr. Brooks' Family Members*

■ The Government also seeks to admit, under Rule 404(b), evidence that Mr. Brooks instructed his family members to purchase DHB stock while he possessed material non-public information. The Court admits this information under Rule 404(b) for purposes of showing Mr. Brooks' plan, intent and/or lack of mistake in engaging in insider trading. Specifically, if Mr. Brooks contends at trial that he did not possess (or did not realize he possessed) material non-public information when he traded, the fact that, on other occasions, he directed family members to trade based on material non-public information would undercut such a defense. In this regard, the Court distinguishes between the "family member" insider trading evidence and the aforementioned JBS insider trading evidence. Unlike the JBS evidence, the "family member" evidence: (1) concerns trading in DHB stock; (2) concerns information Mr. Brooks acquired in his capacity as a public company's officer or director; (3) does not concern any kind of failure to supervise claim; and (4) is roughly contemporaneous with the Indictment's charged conduct.

### 9. "Salacious Acts" Evidence

 Finally, the Government seeks to admit, as direct evidence of Mr. Brooks' "looting," evidence that Mr. Brooks used DHB funds to pay for prostitutes and pornography. The Court agrees that information concerning these acts is admissible as direct evidence. As the Government notes, "[a]nalytically," these acts "are no different from him requiring the company to pay for his children's camp, his wife's face lift or any of the other millions of dollars of improper benefits that he looted from the company." And, as the Government contends, "rather than being unfair," "the salacious character of these activities ... actually provides proof that they were not valid business expenses." Thus, these acts are admissible.

### CONCLUSION

The Government's motion to admit "other acts" evidence is GRANTED IN PART AND DENIED IN PART. The Government may introduce the tax evidence, the asset transfer evidence and the "salacious acts" evidence as direct evidence. The Government may introduce, under Rule 404(b), evidence concerning Mr. Brooks' alleged insurance fraud and the stock purchases by Mr. Brooks' family members. If the Government wishes to introduce evidence concerning how Mr. Brooks "altered" documents in connection with Mr. Bash or Mr. Pelling, the Government is directed to supply the Court with more information concerning Mr. Brooks' supposed alterations of DHB documents.

The Government's motion to admit *Giglio* evidence is GRANTED as unopposed.

SO ORDERED.