In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1502

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANNY HARMON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11-cr-00084-JMS-KPF—**Jane E. Magnus-Stinson**, *Judge.*

ARGUED NOVEMBER 26, 2012—DECIDED JULY 11, 2013

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A jury convicted Danny Harmon of a marijuana conspiracy and related offenses. The district court sentenced him to 360 months' imprisonment. Harmon appeals his convictions and sentence. He first contends that a trial continuance violated his Sixth Amendment right to a speedy trial and that the disclosure of his prior drug conviction deprived him of a fair trial. He also argues that the district court erred in

its fact finding at sentencing. For the following reasons, we affirm Harmon's convictions and sentence.

## I. BACKGROUND

On May 10, 2011, a grand jury indicted Harmon with conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, three counts of attempting to possess marijuana with intent to distribute, and using a telephone to facilitate a drug-trafficking crime. Harmon made his initial appearance on May 13, and was detained pending trial. The court set the trial for July 18, 2011. On June 30, the government filed its one and only motion for a continuance of trial. Harmon objected and the court held an evidentiary hearing on the motion.

Following the hearing, the court granted the motion and reset the trial to August 22. (Defense counsel had advised that he had a pre-planned vacation in early August; this gave counsel a week after that to finalize trial preparation.) In doing so, the court explained that the government needed a reasonable opportunity to investigate potential evidence about Harmon's alleged consciousness of guilt, which evidence did not manifest itself until after his initial appearance and could not have been obtained before his arrest. Because of the need to obtain and review 200 to 250 telephone calls Harmon had made while detained and investigate any resulting leads, the court found it unreasonable to expect the government to be prepared for trial on July 18. The court noted that Harmon did not claim that any actual prejudice would result from a thirty-day continuance.

On July 28, Harmon was charged in a superseding indictment that included the five counts of the original indictment but increased the quantity of marijuana to 1,000 kilograms or more, and added two additional counts: one for the attempt to kill a witness with intent to prevent him from testifying at Harmon's trial and one for attempted intimidation of the same witness.

A jury trial began August 22. The trial evidence established that from September 2002 until January 2011, Harmon engaged in marijuana trafficking, averaging 100 to 200 pounds (113.4 kilograms) of marijuana per month for ten months each year. (There was a lull each year for the July-August growing season.) Harmon hired couriers to travel to Tucson, Arizona, where marijuana was loaded into their vehicles. The couriers then returned to New Castle, Indiana, where Harmon unloaded the marijuana and paid the couriers $75 per pound. Then Harmon; his son, Aaron Harmon; Kurt Baker; and Bradford Raines broke down the marijuana into one-pound packages for distribution. Raines also stored and distributed some of the marijuana for Harmon. Raines and three of Harmon's couriers, John Meadows, Ricky Griffin, and William Wilkinson, testified at trial.

Raines had known Harmon for 12 to 15 years. Harmon had a second home in Florida that Raines had visited eight to ten times with Harmon, Baker, Aaron Harmon, and others. Harmon paid for Raines's flights to Florida. In late 2001, Harmon paid for Raines and their two female friends to fly to Arizona for a resort vacation.

During the trip, they spent time in Mexico, where Harmon introduced Raines to an individual known as "Ralph." Raines later learned that "Ralph" was Harmon's main marijuana supplier. In August 2002, Harmon loaned Raines approximately $125,000 in cash. By that time, Raines had become involved in the marijuana business with Harmon. Harmon paid Raines $500 each time he helped break down the marijuana. Raines testified that from the time he became involved in 2002 until his arrest in 2011, he broke down marijuana once or twice per month (with the exception of July and August). He stated that the loads of marijuana were at least 100 to 200 pounds.

Meadows testified that he began transporting marijuana for Harmon in 2004 or 2005. Meadows believed that he had transported 100 pounds of marijuana on his first trip. He would drive to Tucson, Arizona, park his vehicle, and leave the keys under the floor mat. When the keys had been moved, he knew that the vehicle was loaded and ready for the return trip to New Castle. Meadows's son-in-law, Griffin, accompanied Meadows on two trips. The first trip with Griffin involved about 204 pounds of marijuana and the second trip involved about 100 pounds. Griffin's testimony about the trips corroborated Meadows's account. In February 2008, when Meadows was transporting 94.6 pounds of marijuana, he wrecked his vehicle in Oklahoma. Meadows was hospitalized and arrested, and, as a result, ceased transporting marijuana for Harmon for a while.

Enter William Wilkinson, who transported marijuana for Harmon from Arizona to New Castle five times be-

tween March and August 2009. On August 20, 2009, Wilkinson was arrested in Arizona with approximately 200 pounds of marijuana in his vehicle. He called Harmon to alert him about the arrest, but later agreed to cooperate with law enforcement. Thereafter, Meadows resumed working as a courier for Harmon, making the trips in the same way as before. Meadows made his last trip on January 11, 2011, when he was stopped by law enforcement. He was transporting approximately 103 pounds of marijuana on that final trip.

At the end of the trial, the jury found Harmon guilty of all counts except for the attempted murder and witness intimidation counts. Before sentencing, a presentence report (PSR) was prepared. The PSR concluded that Harmon had engaged in marijuana trafficking from at least December 2001 until January 2011 and held him accountable for 113.4 kilograms of marijuana per month for a total of 10,206 kilograms. (The calculation allowed for two months per year for growing-season lapses.) Harmon did not dispute that the record supported a determination that he was responsible for 113.4 kilograms per month for ten months each year, but he objected to the PSR's commencement of the computation of the trafficking period in December 2001. He contended that the start date should have been August 2002, when Raines joined, resulting in 9,639 kilograms of marijuana attributable to him.

Harmon's preferred starting date would have resulted in a sentencing guidelines base offense level of 34 rather than 36 as indicted in the PSR. An August 2002 start date would have had another favorable benefit for Harmon:

an October 1991 marijuana conviction would not have counted in the calculation of his criminal-history score, so his criminal history category would have been I. However, the district court agreed with the government that the conspiracy did not begin when Raines became involved but had begun much earlier, and as a result, found that Harmon was responsible for more than 10,000 kilograms of marijuana. This increased his base offense level to 36 and made his October 1991 conviction relevant for his criminal history, placing him in criminal history category II. Combined with Harmon's total offense level of 42, this yielded a guidelines range of 360 months to life. The court sentenced Harmon to 360 months' imprisonment, at the bottom of the range. Harmon appeals.

## II. DISCUSSION

### A. Speedy Trial Right

Harmon first argues that the approximate one-month trial continuance violated his constitutional right to a speedy trial. He contends that we review his speedy trial claim de novo. The government argues that we review for plain error because Harmon did not assert his Sixth Amendment speedy trial right in the district court. The government has the better view. *See, e.g., United States v. Hassebrock*, 663 F.3d 906, 915 (7th Cir. 2011), *cert. denied*, 132 S. Ct. 2377 (2012); *United States v. Gearhart*, 576 F.3d 459, 462 (7th Cir. 2009). In any event, whether our review is de novo or for plain error, Harmon's speedy trial claim fails.

We use a four-factor test to evaluate a constitutional speedy trial claim: "(1) whether the delay was uncommonly long, (2) whether the government or the defendant is more to blame for the delay, (3) whether the defendant asserted his right to a speedy trial in due course and (4) whether the defendant suffered prejudice as a result of the delay." *Hassebrock*, 663 F.3d at 915 (quoting *Gearhart*, 576 F.3d at 463). "The first factor . . . is a threshold requirement: 'without a delay that is presumptively prejudicial, we need not examine the other factors.'" *United States v. Loera*, 565 F.3d 406, 412 (7th Cir. 2009) (quoting *United States v. White*, 443 F.3d 582, 589 (7th Cir. 2006)). "Delay approaching one year is presumptively prejudicial." *Id.* The delay in this case is not even close to that: the government sought one thirty-day continuance, and Harmon's trial began within three and one-half months of the date of his indictment. The delay is so short that Harmon cannot get past the threshold requirement.

But because "we have not set a clear cutoff," in terms of the length of delay, *Hassebrock*, 663 F.3d at 915, we consider the other factors as well. Although the government requested the continuance, Harmon is responsible, at least in part, for the delay. The government had obtained serious information that after Harmon was arrested on the indictment, he began getting rid of assets subject to forfeiture and intimidating and perhaps even trying to eliminate one or more government witnesses. Such evidence—evidence of Harmon's consciousness of guilt—likely would be admissible at trial. *See*, *e.g.*, *United States v. Russell*, 662 F.3d 831, 850 (7th Cir. 2011)

(indicating that evidence of consciousness of guilt raises an inference of actual guilt), *cert. denied*, 132 S. Ct. 1816 (2012); *United States v. Mokol*, 646 F.3d 479, 483 (7th Cir. 2011) ("a defendant's attempts to intimidate potential witnesses are probative of his consciousness of guilt"); *United States v. Hatfield*, 685 F. Supp. 2d 320, 327 (E.D.N.Y. 2010) (evidence of defendant's transfer of assets out of country probative of consciousness of guilt). The government sought a continuance to investigate these matters further.

The Supreme Court has explained that "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Barker v. Wingo*, 407 U.S. 514, 531 (1972). It is true that the government had additional reasons for requesting a continuance—it needed more time to obtain other evidence, including forensics reports and marijuana seized in Arizona, Oklahoma, and Kansas, fulfill its discovery obligations to the defense, and assure the appearance of out-of-state witnesses at trial. (Though it appeared that the government was doing some last-minute scrambling to prepare its case, it was not shown to be impossible for it to complete those tasks by the originally scheduled trial date.) Even though the government may be at fault for not getting that evidence earlier, it cannot be faulted for failing to obtain the evidence of consciousness of guilt sooner—*that* evidence did not exist until after Harmon was indicted. The delay caused by the government's need to develop the evidence of Harmon's consciousness of guilt is akin to a delay caused by a missing witness. Thus, the approximate thirty-day delay was reasonable and justified. And

the blame for the delay seems equally balanced here; at most this factor tips slightly in Harmon's favor.

Harmon objected to the continuance, which weighs in his favor. Thus, we consider whether he suffered any prejudice as a result of the delay. "We examine prejudice resulting from a delay in trial in light of the interests the Sixth Amendment seeks to protect." *Hassebrock*, 663 F.3d at 915 (quoting *United States v. Hills*, 618 F.3d 619, 632 (7th Cir. 2010)). The interests are "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* (quoting *White*, 443 F.3d at 591). The Supreme Court has identified missing or deceased witnesses, loss of memory of defense witnesses, and loss of other exculpatory evidence as examples of what is meant by impairment to the defense. *Doggett v. United States*, 505 U.S. 647, 654 (1992); *Barker*, 407 U.S. at 532.

Harmon has not claimed oppressive pretrial incarceration. Nor has he alleged that he suffered any anxiety or concern. And like the defendants in *Hassebrock*, 663 F.3d at 915, *White*, 443 F.3d at 591, and *United States v. Salerno*, 108 F.3d 730, 738 (7th Cir. 1997), where we found no Sixth Amendment speedy trial right violation, Harmon has not shown that his ability to present a defense was impaired in any way. He has not identified a missing witness nor alleged that a defense witness had a loss of memory or that he otherwise was unable to present exculpatory evidence. Indeed, the defense called only one witness to testify at trial—Susan Koenker, Harmon's accountant.

Instead, Harmon claims prejudice because the government was able to gather more evidence against him. Specifically, he complains that the shooting the government used to charge him with attempted murder and witness intimidation occurred between the original trial date and the eventual trial date, the government needed the additional time to obtain and test marijuana evidence, and it had additional time to interview witnesses and prepare its case. He also claims that although he was acquitted of the attempted murder and witness intimidation counts, his defense "was contaminated by the stain of" those counts.

" '[P]rejudice' is not caused by allowing the Government properly to strengthen its case, but rather by delays intended to hamper defendant's ability to present his defense." *Salerno*, 108 F.3d at 738 (quoting *United States v. Tedesco*, 726 F.2d 1216, 1221 (7th Cir. 1984)); *see also Gearhart*, 576 F.3d at 463. "A defendant is not entitled to, and justice is ill-served by, a trial during which the Government is not able to present relevant evidence." *Tedesco*, 726 F.3d at 1222. Evidence of intimidation of a witness raises an inference of consciousness of guilt which raises an inference of actual guilt. *See, e.g.*, *Russell*, 662 F.3d at 850; *Mokol*, 646 F.3d at 483. Thus, evidence of the attempted murder and witness intimidation counts was certainly relevant to the other charges against Harmon.

And while the jury did not find that the evidence proved beyond a reasonable doubt that Harmon was guilty of these counts, the evidence supporting them was not insubstantial. Robert Short testified that Harmon

offered to pay him to "get rid of the fat guy [Meadows]" and "if there was another guy there . . . the fat guy's son-in-law [Griffin], get rid of him, too." Short stated that Harmon drew him a map so Short could follow through on the request, and although the original map was gone, Short drew one from memory. That map was admitted into evidence and Short explained the drawing to the jury, noting that the witness (Meadows) had a maroon Buick that he parked near his house and that the key was broken off in the ignition. After Short testified, Captain Michael Neuner of the Beech Grove Police Department testified that he, Special Agent Kevin Steele, and a detective visited Meadows's residence and confirmed what Short had said about the ignition of Meadows's vehicle being broken. Meadows testified that during the time he was cooperating with law enforcement, he heard gunfire near his house. He also said that on July 21, as he was driving near his residence, someone shot at him twice from a silver car with tinted windows. The government offered evidence of two bullet holes in Meadows's vehicle—one went through the windshield on the driver's side and the other went through the passenger-side door. And Raines testified that in the time leading up to trial, he was followed from the Volunteers of America to his work site by someone in a grey or silver car. To the extent that the evidence of attempted murder and witness intimidation impacted the jury's determination of the other counts, it is because such evidence was probative of Harmon's guilt.

Evidence that Harmon was disposing of assets was not insubstantial either. Agent Steele testified, for example,

that in recorded phone calls from the jail, Harmon had said that large sums of currency were concealed inside the wheels of a child's ATV and directed others to retrieve the currency. Agent Steele stated that he went to see the ATV at Harmon's aunt's residence on June 16 and observed that the left rear tire had been deflated and it appeared from scuff marks on the rim that it had been removed. Recordings of numerous other phone calls Harmon made while incarcerated in which he directed others to dispose of his assets were played at trial. In one such call, he directed an associate to a fireplace where money was hidden.

The evidence of attempted murder, witness intimidation, and asset dissipation raises an inference of Harmon's consciousness of guilt of the offenses of which he was convicted. The brief trial continuance was necessary to allow the government to gather this relevant evidence and present it at trial. Furthermore, Harmon has not shown prejudice resulting from pretrial delay. Even giving Harmon the benefit of the doubt on the threshold requirement, we conclude that his constitutional right to a speedy trial was not violated. Therefore, the district court did not err in granting the government's motion for a trial continuance.

## B. Disclosure of Prior Conviction

Harmon's second argument—that the district court abused its discretion in denying his motion for a mistrial which was based on the disclosure of his prior drug conviction—fares no better than his first. The govern-

ment concedes that the testimony was improper but argues that the error was sufficiently cured by the court's instructions to the jury, repeated at the end of trial, to disregard the testimony. The government also argues that any error in the admission of the statement about Harmon's prior conviction was harmless given the overwhelming evidence of guilt.

On the third day of trial, the government asked its witness Short, who had been incarcerated with Harmon while Harmon was awaiting trial, "Did he [Harmon] tell you how long he'd been in the marijuana business?" Short answered, "He got busted—he told me he got busted back in '91 and took it to trial, and got a four-year sentence. And he'd been, he'd been going full throttle since then, since he got out." Harmon objected to the admission of evidence of his prior conviction and moved for a mistrial. Out of the jury's presence, Short stated that no one from the government had told him not to mention Harmon's 1991 conviction, and no one from the government told him to mention the conviction either.

The district court denied the motion for a mistrial, concluding that the fact of the prior conviction established a time frame, the evidence of the conviction was not introduced to show propensity, and Short gave no indication that the conviction was for dealing in marijuana. The court also sustained the objection, ordered the answer stricken, and instructed the jury as follows: "[A]n objection to the last—the witness's last answer, which referenced some prior conduct of Mr. Harmon, was

made and sustained by the Court, and that answer is stricken from the record, and you may not consider it."

At the beginning of the next day of trial, the jury submitted two questions to the court: "Why did the judge tell the jury to take out the last portion of Mr. Short's testimony?" and "What part of the testimony should we not consider as far as for this trial?" The government expressed concern that the jury didn't understand what testimony had been stricken. The parties and the court discussed how to handle the questions, and ultimately the court advised the jury:

> So that we're clear on the testimony that was stricken, it was this: Mr. Short gave some testimony regarding a prior conviction and length of sentence with respect to Mr. Harmon. That testimony is stricken. It is not to be considered by you in any way in deciding this case.
>
> So that was the only testimony that was stricken, but it was stricken from the record. It is not in evidence.

An admonition regarding stricken testimony was re-iterated in the final jury instructions: "[T]estimony and exhibits that I struck from the record . . . are not evidence and must not be considered."

On appeal, Harmon argues that the jury did not disregard the stricken testimony and that striking the testimony was insufficient to outweigh its prejudicial impact. We review the denial of the motion for a mistrial for an abuse of discretion. *United States v. Vargas*, 689 F.3d 867,

873 (7th Cir.), *cert. denied*, 133 S. Ct. 804 (2012). This is "because the trial court 'is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial.'" *Id.* (quoting *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000)). We "'must affirm unless we have a strong conviction that the district court erred,' and the error committed was not harmless." *Id.* (quoting *Clarke*, 227 F.3d at 881). "The ultimate inquiry then is 'whether the defendant was deprived of a fair trial.'" *Id.* (quoting *Clarke*, 227 F.3d at 881).

Harmon argues that the jury's questions about the stricken testimony show that the jury considered the improper testimony until the following day and thus was unable to follow the court's instruction to disregard the testimony. Though the questions suggest that the jury may have thought about the stricken testimony between Short's testimony and the next day, such consideration is not improper. As the judge instructed, the stricken testimony was "not to be considered . . . in any way *in deciding this case*. . . . . [The testimony] was stricken from the record. It is not in evidence." (emphasis added).

That the jury asked for clarification in light of its uncertainty about what was stricken shows that the jury was being conscientious and striving to understand and follow the court's instructions. The court's initial admonishment was vague because it referred to "the witness's last answer" and ordered "that answer" is stricken. The "last answer," however, referred not only to Harmon's conviction, but also to his conduct in "going

full throttle since then." Thus it is understandable that the jury would seek clarification as to what part of the answer was stricken and could not be considered. And even though the subsequent admonishment emphasized the improper testimony, indeed, referring to the "prior conviction," Harmon's counsel agreed that was how the court should answer the jury's questions. In addition, the court reiterated in its final instructions that the jury was not to consider any stricken testimony, an admonishment applicable to the mention of the prior conviction, in deciding the case. The emphasis was not for an improper purpose and did not deprive Harmon of a fair trial.

"[J]urors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Garvey*, 693 F.3d 722, 726 (7th Cir. 2012) (quoting *United States v. Smith,* 308 F.3d 726, 739 (7th Cir. 2002)). The fact of Harmon's prior conviction—for an unstated offense—was not "so powerfully incriminating." That the jury asked for clarification regarding what testimony was stricken is not indicative that they could not put it out of their minds and follow the court's instructions. The district court was in the best position to evaluate the effect of the statement, and it did so carefully and properly. Nothing in the record suggests that once the jury understood what testimony was to be disregarded, it could not follow the court's instructions.

Harmon argues that the similarity between the past conviction and the offense for which he was on trial was

particularly prejudicial. The prejudice from admission of evidence of a prior conviction for a similar offense may be greater than for a dissimilar offense. *Cf. United States v. Toney*, 27 F.3d 1245, 1254 (7th Cir. 1994) ("The danger of admitting evidence of a defendant's prior conviction for a similar offense is that the "jury will regard past convictions of similar crimes as evidence of . . . a willingness to commit the crime charged."). But neither Short nor anyone else mentioned that the prior conviction was for dealing marijuana. Besides, the bulk of Short's testimony went to the attempted murder and witness intimidation counts of which the jury acquitted Harmon. The acquittal on these counts suggests that the jury did not give much weight to Short's testimony. So, even if the jury understood Short's testimony to have been that Harmon said he had a prior conviction for dealing marijuana, the jury may not have believed him.

The testimony that Harmon had a prior conviction did not deprive Harmon of a fair trial and the district court did not abuse its discretion in denying his motion for a mistrial. And even if there was error in the introduction of the fact of Harmon's prior conviction, the error was harmless given the overwhelming evidence of guilt on the counts of conviction. *See Vargas*, 689 F.3d at 875-76.

## C.  Sentencing Challenges

Now we turn to Harmon's sentencing challenges. He argues that the district court erred by not making

specific findings as to the start of the conspiracy and the quantity of marijuana attributable to him. Yet he also argues that the court erred in determining that the conspiracy began in 1999. Harmon does not dispute that the average amount of marijuana obtained and distributed during the course of the conspiracy was 113.4 kilograms (about 250 pounds) per month for ten months per year. We review the district court's application of the Sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. Bennett*, 708 F.3d 879, 888 (7th Cir. 2013); *United States v. Fluker*, 698 F.3d 988, 1001 (7th Cir. 2012). Factual findings are overturned "'only if our review of all the evidence leaves us with the definite and firm conviction that a mistake has been made.'" *Bennett*, 708 F.3d at 888 (quoting *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011)).

Harmon claims that the district court erred by first determining the base offense level and quantity of marijuana it wanted to attribute to him and then searching for supporting facts. In making it findings, the court explained:

> The Court finds that *the Government has established by a preponderance of the evidence that the quantity of marijuana attributable to the Defendant exceeds 10,000 kilograms* such that a base offense level of 36 is appropriate. The Court bases its finding on the fact that the Defendant acknowledges based upon a start date of September 2002, that properly attributable conduct to him puts us at a figure of 9,639 kilograms. I multiplied 85 times the 113.4—I am sorry.

My math for that then comes out to 9,639, meaning in order to get over to in excess of 10,000, there would need to be an additional 362 kilograms attributable to the Defendant. The Court agrees with the Government that *the evidence establishes that the conspiracy did not begin when Mr. Raines was involved, but, instead, predated far earlier than that time.*

And specifically the hard evidence the Court looks to is the purchase of the home in Florida in 1999 and the lengthy period of cash flow that was far in excess of anything, any legitimate business could have incurred from that time. So really, the Court needed to find about four months to overcome, and the Court finds that there were probably in excess of years that support the finding on the base offense level 36.

Sent. Tr. 82-83 (emphases added). The court subsequently referred to its "finding based on the acquisition of the Florida home is sort of a hard, fast date that is not subject to a credibility finding." *Id.* at 85.

It is a little troubling that the district court articulated its process of determining the quantity of attributable drugs as "get[ting] over to in excess of 10,000," but a close review of the record demonstrates that the court was guided by the evidence rather than a goal of reaching a certain offense level. In the end, we are convinced that it was reasonable for the court to conclude that the conspiracy did not start from scratch when Raines joined, but rather, that it ran for years prior to that, and thus the drug quantity easily exceeded 10,000 kilograms.

Harmon complains that the district court failed to make specific findings as to the start of the conspiracy and the drug quantity in violation of Federal Rule of Criminal Procedure 32. The rule requires a district court to rule on disputed facts that will affect sentencing. Fed. R. Crim P. 32(i)(3)(B). But, as noted, the court found that the government established that the quantity of marijuana attributable to Harmon exceeds 10,000 kilograms. The court also found that the start of the conspiracy predated Raines's involvement in 2002 by years; the court referred to 1999, which takes the conspiracy back much further than necessary to account for the court's finding as to drug quantity. Harmon conceded a relevant conduct start date of September 2002. The court did not have to find that the conspiracy started years before then but only "about four months" earlier to support its finding that Harmon is accountable for more than 10,000 kilograms of marijuana. (As noted, Harmon does not dispute the PSR's estimate of the amount of marijuana per month during the course of the conspiracy.) The court's findings are specific enough to satisfy Rule 32(i)(3)(B) and adequately explain how the court arrived at its guidelines calculations. *See, e.g.,* *United States v. Brown*, No. 12-3413, 2013 WL 2150822, at *5 (7th Cir. May 20, 2013) (noting that Rule 32(i)(3)(B) imposes a "minimal burden"); *United States v. Alviar*, 573 F.3d 526, 546 (7th Cir. 2009) (stating that a district court may use a reasonable estimate of drug quantities at sentencing); *United States v. Phillips*, 37 F.3d 1210, 1213 (7th Cir. 1994) (concluding that the district court's finding that the conspiracy distributed "certainly more than five kilograms" was "a sufficiently specific finding").

As noted, Harmon maintains that the district court erred in finding that the conspiracy began in 1999 because there was no admissible evidence at trial or sentencing to support such a finding. He also challenges whether the purchase of the Florida home was sufficient to establish the start of the conspiracy. The government responds that the district court properly relied on the contents of the PSR, which stated that Harmon had said he purchased his Florida home in 1999, as well as Agent Steele's testimony that marijuana courier Glen Johnson reported during an interview in 2000 that he believed Harmon purchased the home for $460,000. The government also argues that trial evidence supported the finding that Harmon was involved in the conspiracy before Raines joined in August 2002.

"Evidentiary standards at sentencing are not as stringent as those at trial." *United States v. Pineda-Buenaventura*, 622 F.3d 761, 766 (7th Cir. 2010). A district court can determine the amount of drugs attributable to a defendant by a preponderance of the evidence. *Id.* The court "'may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.'" *United States v. Grigsby*, 692 F.3d 778, 788 (7th Cir. 2012) (quoting U.S.S.G. § 6A1.3(a)). The Confrontation Clause does not apply at sentencing. *United States v. Isom,* 635 F.3d 904, 908 (7th Cir.), *cert. denied,* 132 S. Ct. 216 (2011).

More specifically, the court "may rely on a PSR containing hearsay, so long as those statements are reliable."

*United States v. Davis*, 682 F.3d 596, 618 (7th Cir. 2012); *see also Isom*, 635 F.3d at 908 ("[C]ourts may rely on presentence reports containing even double-hearsay, i.e., statements by coconspirators to investigators, so long as those statements are reliable."). "'Indicia of reliability' may come from, *inter alia,* the provision of facts and details, corroboration by or consistency with other evidence, or the opportunity for cross-examination." *United States v. Smith*, 674 F.3d 722, 732 (7th Cir.) (internal citations omitted), *cert. denied*, 133 S. Ct. 546 (2012).

Generally, it is the defendant's burden to show that the PSR is inaccurate or unreliable. *See, e.g., Davis*, 682 F.3d at 613. The defendant must do more than merely deny the facts in the report; instead, he must provide some evidence calling into question the accuracy or reliability of the information in the PSR. *See, e.g., id.* When a defendant has failed to carry this burden, a district court may rely entirely on the PSR. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007).

The district court relied on the PSR and evidence presented at trial and sentencing to make its findings as to the start of the conspiracy and the quantity of marijuana attributable to Harmon. *See Brown*, No. 12-3413, 2013 WL 2150822, at *6 ("The statements the district judge made after hearing the evidence and prior to imposing sentence clearly indicated her acceptance of the version of the facts in the PSR and provided this court with a sufficient record to engage in effective appellate review."). Though the district court did not expressly adopt the PSR's findings, the court's reliance on the PSR

is implicit in its statement that the date of the purchase of the Florida home was "not subject to a credibility finding." The reason that date was not subject to a credibility finding was because Harmon himself had reported the date to the probation officer. Harmon did not challenge the accuracy of the PSR's account of what he had said. Furthermore, the district court essentially stated on the record at the sentencing that its findings would incorporate the trial evidence. ("Defense counsel: I am sure the Court will incorporate all the evidence it heard at trial—The court: True." Sent. Tr. 59.) The court's sentencing entry confirms the incorporation of trial evidence and reveals the court's reliance on the sentencing testimony: "Agents Steele and Sills were called by the Government to testify concerning alleged relevant conduct, and were cross-examined. The Court made its guideline determination based on the record presented at today's hearing and incorporated the evidence it heard at trial." Jan. 20, 2012, Entry at 1.

Harmon argues that the district court erred in finding that the conspiracy started in 1999. His argument has two parts. He first challenges the reliability of the double hearsay on which the court relied—a reference to Agent Steele's sentencing testimony regarding Johnson's awareness of Harmon's 1999 Florida home purchase. The double hearsay, however, is consistent with and corroborated by other evidence in the record. It is corroborated by Harmon's own report to the probation officer that he purchased the home in 1999. Also, Agent Steele testified, based on his review of the report of Johnson's May 2000 interview, that Johnson was aware of

Harmon's purchase of the Florida home. It follows that Johnson could not have been aware of the home purchase at the time of the interview unless the home had been purchased earlier. The timing of Johnson's statements in the interview is consistent with a home purchase in 1999.

The second part of Harmon's argument is that the Florida home purchase is insufficient to establish that the charged conspiracy began in 1999. He complains that the district court made no factual findings tying the home purchase to the charged conspiracy and argues that no trial evidence established that the conspiracy began before 2002. Evidence presented at trial and sentencing, however, established that the charged conspiracy began long before Raines joined it in August 2002. Indeed, the record supports a finding that the charged conspiracy was well under way by early 2000.

The PSR states that Harmon was convicted in 1991 of possession with intent to deliver more than ten pounds of marijuana and sentenced to four years' incarceration and that his sentenced was modified in August 1992 to time served. This information is supported by Short's trial testimony. When Short was asked if Harmon had told him how long Harmon had been in the marijuana business, Short testified that Harmon said he got busted in 1991, got a four-year sentence, and had "been going full throttle since then, since he got out." The government subsequently asked Short whether Harmon had told him when he "became engaged in the marijuana business charged before the

Court?" Trial. Tr. vol. III, 536-37. Short responded affirmatively and the following exchange occurred:

> Question: Did he [Harmon] say that was from around the early '90s?
>
> Answer:   Yes, ma'am.
>
> Question: Is that when he said he started going full throttle and never looked back?
>
> Answer:   Yes, ma'am.

*Id.* at 537. In his reply brief, Harmon notes that Short was responding to a leading question, and Short originally testified that Harmon was busted for being in "the marijuana business," without any reference to the charged conspiracy. *See id.* at 525.

The government argues that the court's statement at sentencing that Harmon "had a long ride, 20 years of pulling this off," *see* Sent. Tr. 105, shows that the court credited Short's testimony that Harmon had been involved in the marijuana business since the early 1990s. But being involved in the marijuana business generally, and participating in the charged conspiracy are not necessarily co-extensive. The court also commented that this was "over a decade-long conspiracy." *Id.* at 103. The conspiracy did not have to commence in 1999 to span more than a decade. The indictment charges a conspiracy "up to and including May 13, 2011." And the PSR indicates that the conspiracy began "[p]rior to December 2001." Of course, 1999 was before December 2001. But little evidence other than Short's

trial testimony—in response to a leading question—ties the charged conspiracy to the 1999 home purchase.

Yet, even if anchoring the start of the conspiracy to the 1999 home purchase was error, such error was harmless. As the government has argued, the conspiracy did not "suddenly start" in September 2002 around the time that Raines joined. The evidence at trial supports the notion that it was a mature and efficient operation by then, and when combined with the information considered at sentencing, a conclusion that the conspiracy operated for years prior to September 2002 is well supported. And the district court also found that the conspiracy began "far earlier than" and "probably in excess of years" before September 2002.

Harmon argues that being involved in the marijuana business, without more, is not enough to establish that the conspiracy stretched back before September 2002. But there *is* more. Raines testified at trial that Harmon introduced him to "Ralph" in December 2001 and Raines later learned that "Ralph" was Harmon's "main man," which Raines understood meant Harmon's main marijuana supplier. Furthermore, Agent Steele testified at sentencing about Johnson's statements regarding Harmon's marijuana trafficking in February 2000. Indeed, at sentencing, Harmon's counsel acknowledged that the government offered evidence from Johnson concerning the "activities by Mr. Harmon and marijuana trafficking in February of 2000 and also some evidence about a Mr. [Ted] Priest [another one of Harmon's couriers] in the year 2000." Sent. Tr. 60-61. Johnson's

statements established that he was transporting marijuana for Harmon in February 2000. According to Johnson, he flew out to Tucson, Arizona, and was met by Ralph Martinez. After leaving Tucson in a motor home, Johnson was stopped by law enforcement with 160 pounds of marijuana. Harmon bonded Johnson out of jail and told Johnson that another courier had been arrested approximately two weeks earlier. Johnson also related that he had met Martinez in Tucson in 1999. Such evidence supports a finding that the conspiracy of conviction went back at least until February 2000.

According to Harmon, however, Johnson's statements were not corroborated or reliable. But the statements were corroborated. At sentencing, Agent Steele testified that the DEA learned that Ted Priest had been arrested in Flagstaff, Arizona, with 189 pounds of marijuana on February 9, 2000. The DEA also contacted the bail bonds-man in Arizona and learned that the same person posted bond for Priest and Johnson. According to Steele, Priest was arrested again in April 2000 in Winslow, Arizona, with close to 200 pounds of marijuana. Johnson's statements about the means of transportation and the marijuana quantity transported for Harmon were consistent with the trial testimony of Meadows, Griffin, and Wilkinson regarding their involvement as couriers for Harmon. This corroboration and consistency with the trial testimony indicates Johnson's statements were reliable, *see, e.g.*, *Smith*, 674 F.3d at 732; thus, the district court could rely on them to support its findings, *see, e.g.*, *Isom*, 635 F.3d at 908.

Harmon also argues that the district court's assumption that his Florida home purchase was "in excess" of what "any legitimate business could have incurred from that time" is not supported in the record. He claims that he earned "substantial income" through his stump removal business and gambling. He also asserts that the Florida property was encumbered with mortgage liens, thus indicating that he had financed the purchase. There is evidence that Harmon's reported income from his stump removal business from 2006 to 2009 was approximately as follows: $119,000; $72,000; $85,000; and $90,000. Special Agent Eric Sills testified at sentencing, however, that during 2006 to 2009 Harmon reported making the following mortgage *interest* payments: $52,189; $69,588; $56,721; and $50,569. On top of that, Harmon made monthly mortgage payments each year in the following approximate amounts: $5,000; $5,100; $5,100; $6,000. Thus, in 2006, Harmon's reported income was merely $6,811 more than these two expenses. And in 2007 through 2009, his monthly mortgage payments and mortgage interest payments exceeded his reported income. It just doesn't add up.

Moreover, there is plenty of other evidence that Harmon was living well beyond his legitimate means. The record established that Harmon incurred credit card charges for numerous trips to Tucson and Florida, a number of trips to Hawaii, a few trips to Mexico, a trip to Singapore, and a trip to Russia. From 2006 through 2010, Harmon made fourteen trips to Arizona and charged approximately $28,504 for this travel. He paid not only for his own expenses but often paid for those

of his companions, including Raines and their girlfriends. And Raines testified that in August 2002, Harmon loaned him $125,000 in cash. The record contains no legitimate explanation as to how Harmon could have obtained this cash to loan Raines.

In addition, Short testified that Harmon said he had a $30,000 bedroom suite, a $30,000 chandelier, and "the best of everything" in his Florida home. The PSR reflects that after his arrest, Harmon directed friends and family to remove the furniture and chandelier "costing tens of thousands of dollars" from his Florida residence. And when the PSR was prepared, Harmon's Florida home was listed for sale for $995,000. The record supports the conclusion that substantial improvements had been made to the property—Raines advised Agent Sills of such improvements, including the addition of two lion head fountains and a Jacuzzi tub. So, too, Agent Sills testified at sentencing about several significant improvements to the New Castle property with which Harmon was connected, including an in-ground swimming pool, a volleyball court, and a five-car garage. This evidence further supports the conclusion that Harmon was living well beyond his legitimate means.

In sum, the record supports the district court's finding of a "lengthy period of cash flow that was far in excess of" Harmon's legitimate business income. Harmon's excess spending raises the reasonable inference that he had other, illegal income. And in the context of the case, the likely source is the marijuana conspiracy.

One last point. Harmon relies on *United States v. Macedo*, 406 F.3d 778, 788-89 (7th Cir. 2005), and argues that

the court's finding based on evidence not before the jury was impermissible fact-finding in violation of the Sixth Amendment. His argument is woefully misplaced. *Macedo* dealt with drug amounts as they affected the statutory maximum sentence. Harmon makes no argument that the district court's findings at issue in this case affected the statutory maximum sentence.

Given the district court's findings, backed up by objective evidence in the record, we are not left with the definite and firm conviction that the court made a mistake in finding Harmon responsible for more than 10,000 kilograms of marijuana. And any error in finding that the conspiracy began with the 1999 Florida home purchase was harmless. The conspiracy did not have to start in 1999 for Harmon to be held responsible for more than 10,000 kilograms. Although the finding as to the start of the conspiracy affected Harmon's criminal history—his 1991 marijuana conviction counted for two points and placed him in criminal history category II rather than I, *see* U.S.S.G. §§ 4A1.1(b), 4A1.2(e)(2)—it did not affect his guidelines range. Given Harmon's total offense level of 42, his guidelines range was the same—360 months to life—whether he was in criminal history category I or II. Because the district court expressly stated that "the minimum sentence under the guidelines . . . is appropriate," we can be assured that any error from the finding as to the start of the conspiracy was harmless. *See, e.g.*, *United States v. Favara*, 615 F.3d 824, 828 (7th Cir. 2010) ("We have no reason to believe that an error that did not affect the Guideline range affected the district court's sentencing decision as the district court

stated its intention to impose a sentence within the applicable Guideline range. Any error was harmless.").

### III. CONCLUSION

Accordingly, we AFFIRM Harmon's convictions and sentence.